IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VERNON EALY, | : | |
| Plaintiff, | : | 3:20-cv-0103 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| WILLIAM BECHTOLD, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM

**March 8, 2021**

## I.   BACKGROUND

Plaintiff Vernon Ealy ("Ealy"), at the relevant time, a state inmate incarcerated at the Franklin County Jail ("FCJ"), commenced this action on January 21, 2020, pursuant to 42 U.S.C. § 1983, primarily raising claims concerning the manner in which the FCJ accommodates his Muslim religious practices.  (Doc. 1).

Presently pending is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Doc. 27).[1]  Defendants filed a supporting brief, statement of material facts, and exhibits.  (Docs. 35, 36, 38).  Ealy sought an extension of time in which to respond to the motion.  The Court granted him until

---

[1] Defendants initially moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court subsequently granted their motion to convert the motion to one for summary judgment.  (Docs. 28, 29).

September 30, 2020, to oppose the motion and cautioned him that his failure to file an opposition brief and respond to Defendants' statement of material facts would result in the motion being deemed unopposed and the statement of material facts being deemed admitted.  (Docs. 41, 42).  He failed to oppose the motion. According to an October 27, 2020 docket entry, Ealy contacted the Clerk's Office and indicated he would be seeking an additional extension of time to oppose the motion.  He did not do so and he has not opposed the motion.  Consequently, the statement of material facts is deemed admitted and the motion is deemed unopposed.  For the reasons set forth below, the motion will be granted.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008).  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).  "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.  The adverse party must raise "more than a mere scintilla of evidence in its

favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249–50.

## III.   STATEMENT OF MATERIAL FACTS

### A.   FCJ Religious Programming and Activities Policy

The FCJ maintains a Religious Programming and Activities Policy administered by the Deputy Warden for Inmate Services, Michelle Weller ("Defendant Weller")[2].   (Doc. 36, ¶¶ 8, 12).   Upon intake at the FCJ, inmates are asked to select a religious preference. (*Id.* at 8).   This allows the inmate to "satisfy the needs of his religious life consistent with the orderly administration of the jail." (*Id.* at 9).   Certain privileges attach to selecting a religious preference, including the ability to possess certain personal religious articles, such as kufis and prayer rugs, and attend worship services.  (*Id.* at 10).

To ensure that the FCJ meets the religious needs of inmates of all faiths, Defendant Weller relies on numerous religious reference sources, including

---

[2]  Deputy Warden Weller was the Deputy Warden for Inmate Services at all times relevant to Ealy's complaint.  (Doc. 36, ¶ 12).

sources that specifically address religious practice by incarcerated persons.  (*Id.* at 13).  She has consulted the United States Department of Justice Technical Reference Manual on Inmate Religious Beliefs and Practices (hereinafter "DOJ Technical Reference Manual") and has been guided by Pennsylvania Department of Corrections ("DOC") policies.  (*Id.* at 14).  She has also consulted with clerics and representatives of organizations from a variety of faiths, including but not limited to Christian, Jewish, and Muslim organizations.  (*Id.* at 15).  With regard to the needs of Muslim inmates, she has repeatedly sought the counsel of the Islamic Society of Western Maryland.  (*Id.* at 16).  Defendant Weller has a strong working knowledge of Islamic tradition and doctrine, especially as these relate to the needs of incarcerated persons.  (*Id.* at 17).

The FCJ also employs Chaplain Isaac Burkholder ("Defendant Burkholder"), who, in accordance with the FCJ's Religious Programming and Activities Policy, is required to "assure equal status and protection for all recognized religions." (*Id.* at 18, 20).  Defendant Burkholder also supervises inmate religious services and provides religious counseling to inmates. (*Id.* at 19).

## B.    FCJ's Policies for Accommodating Religious Dietary Needs

Summit Food Service, the provider of food services to inmates at the FCJ, has assured Defendant Weller that the General Population Meal Plan, as approved

6

by a Licensed Dietician-Nutritionist, serves meals that provide a diet that averages 3,000 calories per day and satisfies the Recommended Dietary Allowances for major nutrients required for adult males.  As an additional alternative, the FCJ administrators provide a Vegetarian/Vegan Meal Plan for any inmate with religious objections to the meat served as part of the General Population Meal Plan, or for an inmate who is vegetarian/vegan for other reasons.  This plan is implemented by removing meat and substituting other proteins in the dishes prepared for the general plan and allows kitchen staff to maintain high levels of efficiency, as the Vegetarian/Vegan overlaps significantly with the food prepared for the General Population Meal Plan.  (*Id.* at 35).  It, too, satisfies the Recommended Dietary Allowances.  (*Id.* at 36).

Each meal prepared for the General population Meal Plan and Vegetarian/Vegan Plans costs approximately $1.18/tray.  (*Id.* at 37).  With the exception of the purchase of pre-packaged kosher meals for orthodox Jewish inmates, the dietary needs of the inmates of every religious sect represented within the facility are satisfied under the General Population Meal Plan or the Vegetarian/Vegan Plan.  (*Id.* at 38).  The FCJ provides pre-packaged kosher meals to Jewish inmates.  This was determined to be the most cost effective means of

providing for the dietary needs of Jewish inmates, given the prohibitive cost of creating and maintaining a kosher kitchen inside the FCJ.  (*Id.* at 39).

Defendant Weller understands that the Muslim diet recognizes foods as either halāl, "lawful", or harām, "forbidden."  (*Id.* at 24, 25).  Harām foods include: pork, pork-by-products, and pork-derivatives; all types of blood; meat of animals which have died naturally, were killed by strangulation, a violent blow, or a headlong fall, partially eaten by scavengers, or sacrificed as an offering to idols; carnivorous animals, reptiles and insects; and wine, ethyl alcohol and spirits.  (*Id.* at 25).  Everything that is not unlawful is considered halāl.  (*Id.*).  Because no foods considered harām are served as part of the General Population Meal Plan, it satisfies the requirements of a Muslim religious diet.   (*Id.* at 26, 27).  If a Muslim inmate believes that the General Population Meal Plan does not satisfy his religious needs, the inmate is permitted to switch to the Vegetarian Meal Plan which, Defendant Weller believes is also compliant with Muslim dietary restrictions. (*Id.* at 28, 29).  Both meal plans are in accord with the dietary restrictions of the Islamic faith.  (*Id.* at 21-23, 36).

After extensive deliberation among the FCJ administrators, the General Population Meal Plan was chosen as the most cost-effective means of satisfying the dietary needs of the broadest segment of the inmate population.  Relying on a

single meal plan to the greatest extent possible improves efficiency in food service at the Jail and helps to control costs.  (*Id.* at 33).  In part, the General Population Meal Plan was chosen because it does not include any pork, pork by-products, or pork derivatives.  FCJ administrators made this choice after considering the many religious strictures in existence that prevent the consumption of pork.  The intention of removing all pork derivatives from the menu, and thus from the kitchen facilities at the jail, was to meet the needs of the vast majority of the inmate population by using a single meal plan.  (*Id.* at 34).

Under FCJ policy, inmates may request special religious diets by submitting a written request to the Deputy Warden of Inmate Services or to the Chaplain.  (*Id.* at 30).  Upon receipt of a dietary request (or any other request based upon an asserted religious practice), Defendant Weller contacts members of the religious community of the requesting inmate, in order to verify whether the request is legitimate according to the tenets of the religious community in question.  (*Id.* at 31).  If, after consultation with religious authorities, it is determined that an inmate's request is valid, it will be approved and forwarded to the Food Service Manager or relevant department.  (*Id.* at 32).

The FCJ's current meal service system consisting of the General Population Meal Plan, the Vegetarian/Vegan Meal Plan, and the Kosher Meal Plan allows the

Jail to service the dietary needs of all inmates with only three (3) full-time kitchen employees and one (1) part-time kitchen employee. (*Id.* at 40). The limited number of meal plans also reduces the need for security checks for deliveries of kitchen supplies, as most of the meals utilize the same ingredients that are all delivered on a regular schedule, seventeen (17) times per month, from the same provider. Because all ingredients are delivered simultaneously from the same provider, the General Population Meal Plan also reduces the number of staff necessary to conduct security checks of food deliveries, and the frequency of such checks. As such, the General Population Meal Plan increases the security of the institution, serves to reduce food service costs, simplify meal preparation, and improve efficiency. (*Id.* at 41, 42).

If the FCJ were required to provide a specific "Halāl Meal Plan," much of the benefits of the General Population Meal Plan would be lost, as multiple, widely different meal plans would be prepared in the FCJ kitchen. This would complicate food service, require the hiring of more kitchen staff, and adversely affect efficiency. (*Id*. at 43). If a "Halāl Meal Plan" were required, the FCJ would likely have to provide a "Buddhist Meal Plan," "Sikh Meal Plan," and other meal plans for various faiths which are all currently served by the General Population Meal Plan and/or Vegetarian/Vegan Meal Plans. (*Id.*

at 44).  A separate 'Halāl Meal Plan would be an enormous expense, and would place a substantial strain on prison resources, impacting the ability of FCJ to provide other services to inmates.  The jail would be required to reduce the number of correctional officers employed, as well as reduce the rehabilitative and educational services provided to inmates, thereby affecting institutional order, and the safety and security of remaining staff and the inmate population.  (*Id.* at 45).

## C.     Ramadan Accommodations

Ramadan is the Islamic "holy month," during which Muslim inmates fast during the day as a display of their devotion.  (*Id*. at 46).  The time for fasting each day is determined by sunrise and sunset—no food may be consumed between these points in the day.  (*Id*. at 47).  During Ramadan, FCJ makes the following accommodations for the religious practice of Muslim inmates:

> a.  Muslim inmates are given breakfast earlier than usual to ensure they eat before sunset.  The kitchen staff prepares bagged breakfasts ("sahoor bag") the night before, which are brought to Muslim inmates before the sun rises each day.

> b.  Muslim inmates are fed dinner at a later time than the rest of the inmate population, according to the time of sunset.

> c.  Muslim inmates are also given an orange to break their fasts in their cell prior to the evening meal.

> d.  Both the bagged breakfast and the evening meal contain one and one-half (1.5) the caloric content of a normal meal under the General Population Meal Plan, so as to compensate for the missed midday meal.

11

e.  The staff takes great care to provide meals before and after sunset, and to account for the varying time of day these events occur as the month progresses.  Though security and operational needs may occasionally necessitate delays of several minutes from the exact time of either sunrise or sunset, the staff always endeavors to serve meals and fruit each day at the proper times.

f.  Following the breaking of the fast with an orange, Muslim inmates are permitted to pray individually in their cells prior to taking their evening meal.

g.  Finally, Muslim inmates may sign up to participate in the Eid Ul-Fitr Feast ("Feast of Eid"), a celebration that concludes the month of Ramadan.  The Feast of Eid is held in the Chapel.  The food served at the feast is the same as that given to inmates generally according to the General Population Meal Plan or Vegetarian Meal Plan.

(*Id*. at 48).

During Ramadan 2019, Ealy filed numerous grievances relating to alleged problems with FCJ's Ramadan arrangements.  (*Id*. at 49).  He complained he was not woken up prior to sunrise to receive a bagged breakfast on the first day of Ramadan 2019 (May 6, 2019).  (*Id*. at 50).  This was due to his late submission of his request to participate in Ramadan.  (*Id*. at 51).  On April 25, 2019, staff posted memoranda on every cell block with instructions on how inmates could sign up to participate in Ramadan.  (*Id*. at 52).  On May 3, 2019, each approved inmate was notified of his approval with a personal memorandum.  (*Id*. at 53).  Ealy submitted his request to participate on May 3, 2019.  (*Id*. at 54).  The request did not reach

12

Defendant Weller's desk until May 6, 2019—he was placed on the Ramadan list that day and received the prescribed evening meal.  (*Id*. at 55).

Ealy complained about delays in Ramadan meal service.  (*Id*. at 56). Occasional minor delays in meal service are inevitable due to security and operational needs at FCJ.  Specifically, there are numerous reasons why staff must sometimes be unexpectedly re-allocated to different areas of the jail, such as fights between inmates, assaults on correctional staff, and lockdowns imposed for the safety of visitors.  Despite these recurring problems, delays in meal service during Ramadan 2019 were infrequent, and lasted for 30 minutes at most.  (*Id*. at 57, 58). Additionally, in response to Ealy's concerns, Defendant Deputy Warden James Sullen ("Defendant Sullen") instructed staff to write daily reports reflecting the time of meal service.  (*Id*. at 59).

Ealy complained that the food in the bagged breakfasts was inadequate, claiming that Islamic doctrine required him to eat specific foods.  (*Id*. at 60). According to Defendant Weller's understanding of Islamic dietary law, which is based on the DOJ Technical Reference Manual, guidance from the Pennsylvania DOC, and consultation with representatives of the Islamic Society of Western Maryland, Ealy is not compelled to consume any specific foods.  Rather, he is only

required to avoid harām foods, of which there are none in the Ramadan breakfast bags.  (*Id.* at 61).

Ealy also complained that the food served at the Feast of Eid at the end of Ramadan was "not halāl" because it did not amount to a "grand feast."  (*Id.* at 62). Defendant Weller contacted the Islamic Society of Western Maryland and specifically inquired of the Imam affiliated with the Mosque whether any special foods should be served at the Feast of Eid.  She was advised that no special foods are required.  (*Id*. at 63).  Ealy's grievances regarding the food served at the Feast of Eid in 2019 were denied.  (*Id.* at 64).

Additionally, Ealy demanded that he be allowed to store food in his cell during the Ramadan fast so he could eat continuously throughout the night.  (*Id.* at 65).  No inmate, regardless of his religious affiliation, is allowed to store food in his cell at FCJ based on a policy addressing cleanliness concerns, as discarded or forgotten food in cells can attract insects or otherwise create an unsanitary environment.  (*Id.* at 66, 67).  The policy is also intended to prevent inmates from hoarding fruit and other foodstuffs that can be fermented into homemade intoxicants.  (*Id*. at 68).  Ealy received ten days of disciplinary confinement for violating this policy on May 29, 2019.  (*Id.* at 70).  This discipline had nothing to do with Ealy's religious affiliation.  (*Id.* at 71).

14

Muslim inmates' rights are not violated when they are required to break their daily Ramadan fast during a defined evening mealtime, rather than gradually throughout the night.  (*Id.* at 73).  Because inmates do not choose when to consume their meals, which are brought to them by jail staff, the time at which Ealy broke his fast each day would not be impacted by his awareness of the current time.  (*Id.* at 74).

Ealy complained during Ramadan 2019 that his rights were violated because there was no daily congregational prayer in the Chapel.  (*Id.* at 75).  Several years ago, during one of Ealy's prior periods of incarceration at the FCJ, the administration implemented a program under which Muslim inmates could attend a daily prayer service during Ramadan.  (*Id.* at 76).  The FCJ decided to discontinue this program following incessant complaints from Ealy that the prayer service did not start at the appropriate time each day, and that this violated his religious rights.  (*Id.* at 77).

Ealy complained that he and other Muslim inmates should be able to assemble for group prayer in inmate common areas, both during and outside of Ramadan.  (*Id.* at 78).  The no-gatherings policy in the common areas applies to all inmate groups, religious or otherwise, and exists for several reasons.  (*Id.* at 79-83).  Such gatherings can impede movement and prevent staff from quickly

15

traversing the facility when necessary, such as during a lockdown or to respond to a fight among inmates.  (*Id.* at 80).  Unsupervised inmate gatherings present the risk of gang recruitment, or other concerted action aimed at disrupting operations. (*Id.* at 81, 82).  Also, preventing group prayer in common areas prevents non-religious inmates from being exposed to religious services in which they do not wish to participate  (*Id.* at 83).

### D.    Rolled Pant Legs and Identification Wristband Policies

Some Muslim communities prescribe rolling one's pants above the ankles during prayer.  (*Id.* at 84).  Inmates are permitted to roll up their pant legs during Muslim services at the Chapel, but are not allowed to do so at other times because rolled clothing can be used to smuggle contraband and signal gang affiliation.  (*Id.* at 86, 87).

Some Muslim communities prohibit the presence of images or pictures of animate objects during prayer.  (*Id.* at 89, 94).  To accommodate this need, the FCJ permits Muslims to turn their identification wristbands inside out during services in the Chapel, and while they pray in their cells.  (*Id.* at 90).  Permitting Muslim inmates to obscure their wristbands at other times would create logistical difficulties and present serious security risks.  (*Id.* at 91).  For example, inmates are frequently escorted throughout the facility by corrections officers, which

requires that the corrections officers be able to quickly identify inmates to ensure each inmate is taken to his assigned location. (*Id.* at 92). Additionally, officers who do not have personal familiarity with particular inmates need a reliable means of identifying inmates they encounter for purposes of distribution of medication and meals, and enforcement of special inmate restrictions (dietary or otherwise). (*Id.* at 93).

### E.    FCJ's Congregational Muslim Services

To enable Muslim inmates to meaningfully practice their religion, they are allowed to utilize the FCJ Chapel in conducting weekly Taleem studies and inmate-led Jumu'ah services. (*Id.* at 95, 105, 106). Defendant Burkholder supervises the inmates during worship. (*Id.* at 96). Despite their best efforts, Defendants Burkholder and Weller have been unsuccessful in security the services of a volunteer Imam to conduction additional Muslim services. (*Id.* at 100-105).

### F.    Inmate Prayer Rugs

FCJ provides individual 18x30" prayer rug to each Muslim inmate. (*Id.* at 107). These rugs are not used for any other purpose or by inmates of any other religious denomination. (*Id.* at 112). Inmates are permitted to keep the prayer rug in their cells for individual prayer throughout each day and to take the rug to the

17

Chapel for use during Taleem and Jumu'ah services.  (*Id.* at 108, 109).  It is therefore unnecessary to order an area rug for the Chapel, per Ealy's demands.

The individual prayer rug provided by the facility is the only rug Muslim inmates may use for prayer.  Inmates are not permitted to receive prayer rugs from persons outside the jail.   (*Id.* at 110).  This promotes uniformity among Muslim inmates and prevents some inmates from having higher-quality or more visually appealing prayer rugs than others.  (*Id.* at 114).

Upon release, the inmate must return his prayer rug, which is then laundered and placed back into rotation.  (*Id.* at 111).

### G.    FCJ's Library of Islamic Text

All inmates at FCJ have access to the facility's library of religious texts, which include the Qur'an, the Hadith and Sunnah, and other Islamic study materials.  (*Id.* at 116).  Following guidance from the Pennsylvania DOC, the FCJ administration elected not to purchase a copy of the "Noble Qur'an" in 2019 because the text promoted violence  (*Id.* at 117).  In 2020, the FCJ administration reconsidered its position on the Noble Qur'an and now provides it as part of the facility's library of religious texts.  (*Id.* at 118).

**IV.** **DISCUSSION**

**A.** **Constitutional Claims**

Section1983 of Title 42 of the United States Code offers private

citizens a cause of action for violations of federal law by state officials.  *See*

42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress....

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v.*

*Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a

plaintiff must allege "the violation of a right secured by the Constitution and laws

of the United States, and must show that the alleged deprivation was committed by

a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

Ealy challenges various FCJ prison policies as being violative of the Free

Exercise Clause of the First Amendment.  The First Amendment provides, *inter*

*alia*, that "Congress shall make no law respecting an establishment of religion, or

prohibiting the free exercise thereof . . . "  U.S. CONST. amend.1  It offers

protection for a wide variety of expressive activities, which are lessened, but not

19

extinguished, in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Although prisoners must be afforded "reasonable opportunities" to exercise the religious freedoms guaranteed by the First Amendment, *see Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972), imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment right to the free exercise of religion.  *O'Lone v. Shabazz*, 482 U.S. 342, 348-49 (1987).  Only beliefs which are both sincerely held and religious in nature are entitled to constitutional protection.  *Wisconsin v. Yoder*, 406 U.S. 205, 215-19 (1972); *Dehart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000); *see also Africa v. Pennsylvania*, 662 F.2d 1025, 1029-30 (3d Cir. 1981) (identifying three indicia of religion as (1) attempting to address "fundamental and ultimate questions having to do with deep and imponderable matters," (2) being "comprehensive in nature," consisting of a "belief system" rather than "isolated teachings," and (3) recognizing the "presence of certain formal and external signs" such as the clergy and observance of holidays).  Defendants do not dispute that Ealy's sincerely held religious beliefs are entitled to constitutional protection.

Once it is established that the individual has a belief that is "both sincerely held and religious in nature," the United States Supreme Court's *Turner v. Safley*

test must be applied to determine whether the curtailment at issue is reasonably related to penological interests. *DeHart*, 227 F.3d at 51. "[*Turner*] directs courts to assess the overall reasonableness of such regulations by weighing four factors. 'First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it,' and this connection must not be 'so remote as to render the policy arbitrary or irrational.' Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that 'fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests.'" *DeHar*t, 227 F.3d at 51, quoting *Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999) (internal citations omitted). "The objective is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity." *Id.* at 59.

The most important prong of the *Turner* analysis requires a rational connection between the policy and the legitimate governmental interest that justifies it. *Nasir v. Morgan*, 350 F.3d 366, 372 (3d Cir. 2003). "According to

*Turner*, a regulation will be sustained unless 'the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.' " *Id., citing Turner*, 482 U.S. at 89-90.  " '[T]he burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it." *Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003).

Defendants contend that the policies that resulted in the restrictions of which Ealy complains are rationally related to legitimate penological goals.  Specifically, as set forth in detail in the Statement of Material Facts, *supra*, the various policies are in place for a myriad of reasons which are rationally related to valid legitimate correctional interests such as security concerns, simplification and uniformity in operations, cost containment, and increased efficiency and administration. (Doc. 36, ¶¶  33, 35, 41-43, 67, 79-83, 87, 91-93, 114-118).  This uncontroverted evidence demonstrates that policies and practices applicable to every area challenged by Ealy are rationally related to valid legitimate penological interests.

As to the second factor, it is undisputed that FCJ provided Ealy with a Halal compliant meal plan, provided him the opportunity to participate in worship services, to access religious education and counseling, accommodated him for religious observances, provided him the opportunity to attend Jumu'ah, and participate in Taleem studies, permitted daily prayer practices, supplied him with a

prayer rug, and accommodated him during Ramadan and for religious observances of significant holidays.  (Doc. 36, ¶¶ 18-20, 23-32, 48, 55, 86, 90, 105-110 ).  Ealy does not dispute that the FCJ provides him and other Muslim inmates with these opportunities to practice his religion.  The second *Turner* also factor weighs in favor of Defendants. *See Williams*, 343 F.3d at 219.

With respect to the third factor, Defendants have clearly articulated the impact accommodation of Ealy's many requests, beyond the accommodations already in place, would have on FCJ's guards, other inmates, and on the allocation of prison resources generally.  (Doc. 36, ¶¶ 43-45, 79-83, 91-93, 114).  This factor weighs in favor of Defendants.

Finally, "the [fourth factor] inquiry is whether there are alternatives that would impose only '*de minimis* cost to valid penological interests.' " *Fraise v. Terhune*, 283 F.3d 506, 520 (3d Cir. 2002) (quoting *Turner*, 482 U.S. at 91). The record demonstrates that the FCJ has gone to great lengths to provide religious accommodations to Ealy and Muslim inmates.  It also shows that additional alternatives cannot be provided at a *de minimis* cost, monetary or otherwise.  There is evidence that providing a specific halal meal plan would increase costs, tax prison resources, impact efficiency, and result in curtailment of other prison programs.  (Doc. 36, ¶¶ 43-45).  Eliminating or altering the rolled pants,

identification wrist band, and no gathering policies would jeopardize staff and inmate security and orderly administration and operations.  (*Id.* at 79-83, 91-93). And allowing inmates to store food in their cells presents, *inter alia*, sanitation concerns.  (*Id*. at 67-69).

Significantly, the party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  *Williams*, 891 F.2d at 460.  Ealy has wholly failed to meet this burden in that he neglected to oppose Defendants' motion for summary judgment.  Despite his failure to oppose the motion it is clear on this record that Defendants made every attempt to strike a balance between accommodation of Ealy's rights and the challenges of logistics, budgetary constraints, security, and orderly administration of the FCJ.[3]  Defendants are

---

[3]  Notably, Ealy unsuccessfully challenged a number of the same FCJ policies in an action he filed in 2013.  The Court set forth the following in rejecting Ealy's prior challenges:

> Defendants have established that the policies and practices related to the employment of a full-time Iman, the religious services policy, restrictions on communal prayer, use of the chapel, supervision of religious services, use of prayer oils, meal preparation and distribution, and religious materials satisfies the "reasonableness test." *See Turner*, 482 U.S. at 89; *O'Lone*, 482 U.S. at 349. The policies and practices with respect to every area challenged by Ealy further a legitimate governmental interest unrelated to suppression of expression. There is simply nothing in the record to lead the court to conclude that Ealy's ability to practice his faith was restricted or that he was prohibited from practicing his religion in any manner. For instance, he was provided opportunities to practice his religion on a regular basis in the facility's chapel. "A special chapel or place of

24

therefore entitled to an entry of summary judgment on Ealy's First Amendment claim.

## B.    Religious Land Use and Institutionalized Persons Act of 2000

Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides, in relevant part, that "[n]o government shall impose a

---

worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (*per curiam* ); *see also Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir. 1970) (no affirmative duty to provide an inmate with a clergyman of his choice). Also, the fact that FCJ provided a general Chaplain, who scheduled and supervised Muslim worship, was permissible. Providing Chaplains for only the largest major faith groups and prohibiting group worship in the absence of an approved faith group leader, when faced with legitimate budgetary constraints and security concern, is permissible under the First Amendment. *See Smith v. Kyler*, 295 F. App'x 479, 481 (3d Cir. 2008). Further, restricting religious practice in the prison yard is permissible when other means of worship are available. See Smith, 295 F. App'x at 483–84. The inability to provide Halal meals due to the substantial burden it would place on prison resources, did not impermissibly curtail Ealy's right to free exercise of his religion as all indications from the record are that the General Plan satisfied Halal meal requirements. *See Williams v. Morton*, 343 F.3d 212, 220 (3d Cir. 2003) (rejecting inmate's claim that failure to provide Halal meat in lieu of vegetarian meals violated their First Amendment rights); *see also Abdul–Aziz v. Ricci*, 569 F. App'x 62, 66–67 (3d Cir. 2014). Also, the decision to ban prayer oils because they could mask the scent of other contraband, be used for illicit trades or purposes, be used to threaten other inmates, or provide a means for inmates to slide out of restraints, was clearly permissible as it was security driven and had no basis in the free exercise of religion. *See Banks v. Beard*, No. 14–4081, 2015 WL 509515, at *5 (3d Cir. Feb.9, 2015). Finally, although Ealy's request for a certain version of the Qur'an was denied, based on legitimate security concerns, he had access to the Qur'an endorsed by the Islamic Society of Western Maryland and to additional religious materials. There is nothing in the record that suggests that he was deprived of texts that provided critical religious instruction. *See Sutton v. Rasheed*, 323 F.3d 236, 255–56 (3d Cir.2003).

*Ealy v. Keen,* No. 3:13-CV-2781, 2015 WL 1471577, at *11 (M.D. Pa. Mar. 31, 2015)

substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see also Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005). Although Congress intended that RLUIPA be construed "in favor of broad protection of religious exercise," *see* 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter*, 544 U.S. at 723.  Congress indicated that in the event an inmate's request for religious accommodation would "become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition."  *Id*. at 726.

1.    <u>Monetary Damages</u>

        a.    *Individual Liability*

Ealy cannot recover money damages against defendants in their individual capacities under RLUIPA.  It is well-settled that RLUIPA does not permit an action for damages of any sort against defendants in their individual capacities. *See Sharp v. Johnson*, 669 F.3d 144, 155 (3d Cir. 2012).   Defendants motion for summary judgment will be granted in this regard.

        b.    *Official Capacity*

Conversely, Ealy can proceed against the Defendants in their official capacities. *See Kelley Bey v. Keen*, Civ. A. No. 13-1942, 2014 WL 3563475, at *13 (M.D. Pa. July 17, 2014) (holding that official capacity RLUIPA claims against county officials was not barred by the Eleventh Amendment which only applies to states (citing *Opulent Life Church v. City of Holly Springs, Miss*., 697 F.3d 279, 289-90 (5th Cir. 2012) (holding that while states may not be held liable for money damages under RLUIPA, municipalities and counties may)); *Munic v. Langan*, Civil No. 4:CV-13-2245, 2015 WL 5530274, at *4 (M.D. Pa. Sept. 18, 2015) (permitting RLUIPA claims for damages against official-capacity municipal defendants to proceed).

Under RLUIPA, the plaintiff must show that his religious exercise has been

27

burdened substantially by the challenged conduct.  *Washington v. Klem*, 497 F.3d 272, 277-78 (3d Cir. 2007).  "[A] substantial burden exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior to violate his beliefs." *Id.* at 280.  The plaintiff bears the initial burden of demonstrating that a prison institution's policy or official practice has substantially burdened the inmate's religious practice.  *Holt v. Hobbs*, 574 U.S. 352, 360 (2015).  If the plaintiff shows that prison administrators' actions or inactions have imposed a substantial burden on the exercise of his religion, the burden shifts to the prison administrator to establish that the challenged conduct furthers a compelling governmental interest and that it is the least restrictive means of furthering that interest.  *Holt*, 574 U.S. at 362.

The initial burden falls on Ealy to demonstrate that FCJ's policies have substantially burdened the practice of his religion.  Again, he has failed to oppose Defendants' motion for summary judgment and, consequently has not established that any of the policies substantially burdened his religion.  Nor can we discern any such burden from the record before us.  Accordingly, summary judgment in favor

28

of Defendants is appropriate.

### C.    Equitable Relief

To the extent Ealy seeks declaratory or injunctive relief, whether in the context of the First Amendment or RLUIPA, his claims are moot because he is no longer incarcerated at that facility.  He no longer presents a live case or controversy for injunctive relief regarding the policies or practices at FCJ because an injunction where he is no longer imprisoned would not provide him meaningful relief.  *See Abdul–Akbar v. Watson*, 4 F.3d 195, 206–07 (3d Cir. 1993).  Further, on this record, any future incarceration of Ealy at FCJ is speculative, so his case not does not present an issue capable of repetition, yet evading review regarding the relief against the FCJ defendants.  *See id.*  Although "[t]he mootness of a  . . . claim for injunctive relief is not necessarily dispositive regarding the mootness of  . . . [a] claim for a declaratory judgment,"  *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011), Ealy's claims for declarations are similarly moot, *see id*. at 1027–28 (10th Cir. 2011) (explaining that prison-specific claims are moot on transfer because a declaration that a prisoner was wronged at institution where he no longer resides has no effect on a defendant's behavior toward him).

## V.    <u>**CONCLUSION**</u>

Based on the foregoing, Defendants' motion (Doc. 27) for summary

judgment is deemed unopposed and will be granted.

A separate Order will issue.